17-1112 American Fuel & Petrochemical Manufacturers Petitioner v. Surface Transportation Board et al., Mr. Morata for the petitioner, Ms. Jenkin for the respondents. Thank you Your Honor and may it please the Court. Sean Morata for the American Fuel & Petrochemical Manufacturers. This case is about whether BNSF can, through a monetary penalty, phase out tank cars that Congress, in its considered judgment, said that shippers could continue to use on BNSF's lines. The answer is no. After all, BNSF lobbied hard, both during the rulemaking process and during the fast tax passage, for just the phase out that they attempted to oppose here. They should not be allowed to do, through a penalty on shippers, what they couldn't do in the rulemaking process and in the legislative process. Before you get too far into the merits, could you address mootness? I don't see why this case is still alive because we have an intervening statute that seems to prohibit all of the shipping that's relevant to the case on the very kind of train car that's relevant to the case. Sure, Judge Katsas. I think there's three reasons that we lay out in our reply brief why this case is still alive, at least to some extent. Of course, we agree that there will not be DOT-111s continuing to carry crude oil. The FAST Act prohibited that on January 1st. And you agree that there's no category of petroleum or other product that you would want to ship on this kind of car that isn't covered by the statute? Well, I think I should be clear, Judge Katsas. The FAST Act on January 1st, 2018, barred crude oil in DOT-111s. But there's still things like ethanol, which will phase out in, I think it's May 2023, which I think relates to our point that this is capable of repetition yet evading review. Right, but ethanol isn't in this case. It's not in this case. So we're talking about an argument against mootness based on the precedential impact? I don't think it's just precedential impact on repeating yet evading review because as this court said in the United Brotherhood case that we cite in the reply brief, it's not whether the same historical facts will occur. Of course, there's not going to be petroleum products in DOT-111s. But the question is whether the legal question will recur. And that is that BNSF can impose a tariff to accelerate the various FAST Act phase-out periods and then arrange the tariff in such a way such that we can't get to, under this court's case, it's the Supreme Court, in time by the time the tariff ends because of the FAST Act. And in fact, on page 19 of BNSF's brief, they say this is going to happen again. So this case, which is about petroleum, is moot to that extent and your theory is there may be some future case about ethanol and that keeps this case alive because this decision might have precedential or persuasive impact on the next case. Well, not just precedential impact, but also the fact the legal question is going to recur and it could consistently evade review. But that's just one of our theories. Why would it evade review? It would evade review because BNSF can structure its tariffs in such a way that, for instance, this court has said that as a rule of thumb, about a two-year period evades review. So that, you know, if you try to accelerate the future phase-out by up to two years, you can always arrange your tariff in such a way that it will be moot before we can obtain judicial review. But that's just one of our theories, I should be clear. Our other theory and our lead theory is that we requested a declaratory order, that's JA-73, and individual members could, based on that declaratory order, bring damages action. So here we have a trade group that brought the broad complaint that this was an unreasonable practice. Could the individual members bring the damages action without this, without going through this proceeding, the deck action here? I believe they could, Judge Katsas, but there's a reason that... So then, you know, any time you have a case with prospective relief, prospective relief only and the complaint hasn't pleaded damages and there's a mooting event, someone could say, well, the deck action is not moot because it could then, doesn't have to be, but it could be the predicate for a later damages claim and that's just not the way the jurisprudence seems to work. Well, I'll give you a case, Judge Katsas. I apologize it's not in the brief, but it's Nelson v. Miller. It's a Seventh Circuit case, 570 F. 3rd 868, where it does say that a declaratory judgment isn't necessarily moot where it is a predicate or a lead to damages. Now, in that case, it wasn't the sort of bifurcated case we have here where there's a trade group and then the later action by the individual members. But I think there's a reason that trade group litigation exists. I'll raise you one and give you two Supreme Court cases which aren't in the brief, but Pryor v. Newkirk, Alvarez v. Smith are cases where you have someone seeking declaratory and injunctive relief. There's no damages action involved. There could have been a damages action and the court, there's a mooting event and the court dismisses the declaratory count as well as the injunctive count, notwithstanding the possibility of damages actions. I can't say that I'm conversant with those two cases, Judge Katsas. Fair enough. But I think also it relates also to the Board's practice here, which is that the Board has a regulation, 49 CFR 1130.2c, where it says that if you're bringing a damages claim, one of the things you should do is point out whether there's a previous case before the Board that addressed the same issues. And so our deck action here, and again, the question on mootness... But all it says is that you have to advise the Board. It doesn't say anything about what the consequences of that would be. I think that's right, Judge Tatel, and I think perhaps Board counsel could talk about this as well. But the question on mootness, is there any effectual relief that this Court can still grant? Not a lot of effectual relief, but any effectual relief. And that's still effectual relief for our members, that they could still obtain this declaratory order. And this is the reason people have trade groups that bring these broad claims, and then they can follow on just on the individual damages claims as cleanup. But I will say that if the Court thinks that this is moot, then what it at least needs to do is vacate the Board's decision below, so that we can be restored to the status quo. Because I think as the Board, and as BNSF, all point out, is this is an important issue, and this case should not stand as a precedent if we have not been able to obtain judicial review from this Court. But turning back to the merits, I think it comes down to the Board saying that we went through the wrong door, that we went through the unreasonable practice door when we should have gone through the rate reasonableness door. But a rate reasonableness case would not address AFPM's complaint in this case. AFPM's complaint was not that you are charging us too much relative to your costs for this particular movement of tank cars. Our complaint is that you have an improper purpose, that you should not charge this a surcharge at all. So it's not that it's a $1,000 surcharge or a $100 surcharge, even a $1 surcharge would still be improper, because it has the improper purpose of countermanding an authorization granted by Congress that we could use these DOT-111s on BNSF's line until they're phased out. And so a rate reasonableness case, which is structured such that you look at the cost of providing service and the revenue that is derived from it, and then you compare those numbers, and you say, is there market dominance, and then if there is, you think about what the maximum rate should be. None of that would have addressed our claim, because our point is, it's not about whether you're making too much money. It's about that you have this improper purpose in trying to coerce shippers. But the only manifestation of the improper purpose in this case is with regard to the price term of service, as opposed to something else. And that, to me, sounds like a rate. I don't think it is, Judge Katsas, because you could have said the exact same thing about rail fuel surcharges, right? In fact, rail fuel surcharges was even more stark if you want to line it up against Union Pacific, because the claim there was that the amount you are charging us, this surcharge for fuel, is too much relative to the cost of fuel. That sounds a whole lot like a comparison between cost and revenue being derived. And so if that was the rule, Judge Katsas, I think rail fuel surcharges should have come out differently. But the board said... Well, Union Pacific itself, I think, is classic, exact that kind of case. The claim by the shippers in that case was, you claim that you are charging us this extra money because you have additional risk and you have additional costs in transporting spent nuclear fuel. But actually, you're charging us too much. You're deriving too much money from it. That, again, is a classic rate reasonableness case. But our case isn't like that. But what this court said was, there's admittedly a gray area between rates and practices, but when the challenged conduct manifests itself exclusively in, key phrase is, level of rates, you said that's price. I mean, that's level. I think that is one line out of an opinion that also talked about a great deal of other things. That the case was brought as a rate reasonableness case at the commission. It was litigated as a rate reasonableness case at the commission. That the remedy provided was a maximum rate that could be charged by the shippers. All of those things also went into this court's determination. And not only that, but that's how the board has consistently distinguished Union Pacific in rail fuel surcharges. But even if you think Judge Katsas... It's one line of an opinion, but it sure sounds like it's the holding, right? It's the last paragraph in the relevant section where the court is summing up and stating the outcome. But I think right before that it said, in this case, I think it was talking about the facts before the court. But even if you think, Judge Katsas, that Union Pacific is that bright line, the board had to engage with our brand X argument. Because obviously Union Pacific is a pre-Chevron case. And Union Pacific did not suggest that was the only reasonable reading of the statute. Well, but it does, right? Because it says there's a lot of potential ambiguity between rates and practices. But in the circumstance of this case where the only manifestation is level of rate, that's a rate. Well, but in the pre-Chevron world, in the face of ambiguity, what the court did was it resolved the ambiguity itself. But in the post-Chevron world, as we all know, the board has the power to set that line. And we gave the board an extensive argument, JA 274-275, that said, you know, even if that was the line back then, it just doesn't have policy justifications today. And the board did not respond to that argument, except to cite a different case where all they said was, hey, by the way, we declined to extend Union Pacific. So if they have a policy reason why that should still be the line, they should have given it to us. So here's the relevant sentence. Wherever the final line is drawn between practices and rates, which sounds like there's a range of ambiguity, I agree with that. We conclude the ICC's regulation here, we conclude, falls squarely on the side of rates. Seems to me like what the court is saying is that that instance is beyond the bounds of reasonable interpretive debate. I don't think so, Judge Katsas, just because of the way things worked in pre-Chevron. Because what courts did back then is they said, look, there's ambiguity. Our best reading of the statute is this. But post-Chevron and under Brand X, and all we're saying is they've got to give us a response to the argument, and they never did. I'll reserve my time for rebuttal. Thank you. Good morning, and may it please the Court, I am Carolyn Jacobs-Chaykin on behalf of the Surface Transportation Board in the United States. With me at Council's table is Anthony LaRocca of Steptoe & Johnson, representing Intervenor BNSF. Mr. LaRocca has asked that I mention that although he has not been allotted any argument time, he is available to answer any questions specific to BNSF if the Court has any. If this Court does not dismiss the case as moot... Well, do you think it's moot? Well, yes, we believe there is a strong argument that the case is moot for all of the reasons that the Court has already made. We think at this point there is no effectual relief that AFPM can obtain here. It is an association. It seems to be its lead argument, as opposing counsel notes, is that its members might someday be able to bring future damages suit. When I last checked, which was yesterday, none of AFPM's members have come before the Board and sought damages or reparations for paying this $1,000 differential for the unjacketed DOT-111s. And the fact that there could be a declaration at some point, if this were to be remanded and if the Board were to determine it was an unreasonable practice that would somehow essentially create precedent, that does not create a live controversy here. If so, no case would be moot. What do you think about counsel's suggestion that if we do think it's moot, we vacate? Well, we certainly would like to see the decision kept in place. We believe strongly it was decided correctly. There are findings you could make that AFPM's own actions contributed to the demise of its relief. There's an argument that this... It's an intervening statute. It is an intervening statute that's the most proximate cause, but AFPM chose the forum that it chose initially knowing about a deadline and knowing that it should have known that this was a clear rate case under Union Pacific. It's a straight-up application. The District Court recognized that, as well as the Board. They have a pending appeal. Their opportunity to seek review is frustrated by the intervening act of a non-party, namely Congress. Yes, and we would understand if the Court decides to vacate the Board's decision here. We do think, though, that this is well-plowed ground, so it wouldn't really spawn any new legal consequences for AFPM to say that, under Union Pacific, a case in which the only manifestation of the alleged practice is a rate level, then it has to be decided as a rates case. But if the Court were to not decide that this is moot, we think that this was properly decided and the Court should affirm because this was a very straightforward application of on-point precedent from this Court in Union Pacific. As the Board properly found, the only thing, the only conduct, the only manifestation of what AFPM was challenging was a rate, an increased base rate for line haul transportation. It's a little bit different, though, to the extent the challenge in Union Pacific was to the amount of the charge, right? Yes, it was, but the Commission in Union Pacific, in the case that this Court set aside in Union Pacific, the Commission made essentially the exact same arguments that AFPM is arguing here. It said, we, you know, we believe that even though the only practice here is the charging of higher base rates, this was an attempt, with an underlying purpose to avoid the transportation of hazardous materials in compliance with the regulatory regime. Right, but the statement that I was pressing your friend on,  but nonetheless, it comes in the context of a very different case. And couldn't there be at least a litigable, arguable issue about whether, you know, level of rates, right, which the key phrase from Union Pacific means anything about rates or means level of rates, it's a challenge to the quantum. And you didn't get into that. It may ultimately be that the logic, the holding or the logic of Union Pacific covers both kinds of cases, but you didn't address that before the agency. Your theory was just Union Pacific, we're bound, end of case. Well, we addressed it in the sense that in trying to distinguish rail field surcharges and what happened there, I mean, that was a situation involving a component of a rate, but what was deemed the unreasonable practice there, as the board found here, was a misrepresentation. There was conduct other than the mere charging of a rate. If the only conduct, if the only manifestation is the charging of a particular rate or a rate component that affects the rate level under Union Pacific, that would be barred. But in rail field surcharges, we said, no, no, what happened here, the punishment or the conduct that we're punishing or condemning an unreasonable practice was the application of a misleading label. If the carriers had not separately set aside, separately calculated it and called it a fuel surcharge, which suggests that the calculation was to recoup movement specific fuel costs, when actually it had nothing to do with that. There was no reasonable relationship to recouping fuel costs. Then this would have been a straight up application of Union Pacific. There was other conduct, other manifestation besides just a charge or a overall base rate. Whether it was the overall base rate, whether it is simply a separately identifiable surcharge or identified surcharge, it all affects the level of the rate. And under the statute, carriers may set any rate, unless there's a further argument, which is, let's assume you're right about rate is rate and it doesn't matter if it's a legal argument or a quantum argument. You still have this further point that Union Pacific is pre-Chevron. We do have some pretty strong language saying that the interpretation that this court adopted is the best reading of the statute. But we don't quite have in explicit Chevron terms that that is the only one that could be permissible. Union Pacific was pre-Brandex, so the court obviously didn't know it needed to specify this is the only reading. Which may mean you have some wiggle room under Brandex. It may. However, I personally would not want to be the one standing in front of you telling you that the I mean, that's not something the agency takes very lightly. We do believe that the board adequately, more than adequately addressed the Brandex argument, which AFPM itself relegated to a footnote in its reply. A lengthy convoluted footnote, but it was a footnote. And we did address it. The board said it cited to a recent decision very similar to AFPM's case, called the CF Industries case, where we said that Union Pacific precluded an unreasonable practices finding where, as here, there was no other manifestation of the alleged practice except a higher undivided base rate. So, we cited that case. We said AFPM has not persuaded us that we should depart from that. We have been following Union Pacific you know, for the last 30 years it's been on the books. And we And it's the agency practice if we look at agency practice since Union Pacific would we find a lot of cases like this one where the challenger says, I am not challenging the amount. I am challenging the legal permissibility of this kind of consideration? You know, I'm not. Or is this one new? It's a fairly new issue. I mean, but with that said, what opposing counsel seems to be stressing is the improper purpose underlying the charge here. They're challenging the mere existence of the charge the surcharge they call it, but really it's an undivided base rate that's higher. But they're saying that the problem is the purpose. Well, that didn't matter in Union Pacific. The commission actually based its decision to find it as an unreasonable practice on the fact that the purpose of the railroads was to try to avoid their common carrier obligation of nuclear waste in accordance with a federal safety regime. That argument obviously didn't fly and this court rejected that argument and said, you know, the purpose, the intent here is irrelevant when all that you're actually doing all that the carrier is actually doing is charging a particular rate. In addition, we also think that Conrail is obviously inapplicable. I know counsel didn't address that, but that's the primary difference here between Conrail and the Union Pacific case. In Conrail, the unreasonable practice was the imposition of mandatory safety restrictions in addition to a rate increase. But it wasn't that rate increase that was examined, it was the safety requirements. And in Union Pacific where the railroads decided not to impose specific safety requirements per se, they just lumped it into a higher base rate, Union Pacific said that we can't review. The statute as to the divide between rates and practices, the statute is clear at least to the effect that if it all is happening is a rate level is changing, that has to be decided under the board's rate reasonableness practices and it has to meet that threshold requirement of market dominance. Congress was very clear that its intent was to allow carriers to set any rate free from interference by the board or the commission at the time. They wanted the railroads to return to financial health, they wanted them to be able to set rates in response to market conditions and not have too many limitations on that except the market dominance requirement. And if this court has no further questions, I would request that you affirm. Thank you very much. I think my friend on the other side has given a very strong explanation of what a board could reason, perhaps on remand, but none of what was said from the podium today is in the board's decision. And it's of course a bedrock part of this court's practice that you can't affirm an order on the basis of things that aren't in the board's order. As I think the board admitted, our argument is a fairly new one. And in the face of that argument, as you pointed out in your questioning Judge Katz's, you could have an argument that Union Pacific and the level of the rate discussed there could apply to everything relating to the rate. Or you could say it just means when you're challenging $1,000 or $900 or $500. And in the face of that ambiguity, where we made a strong argument that the rate reasonableness procedures that the board has would essentially be an exercise in futility because they don't actually address the legal argument we're making, the board had to give a reasoned explanation for why it was going to go one way as opposed to the other. But all it said in its order was, Union Pacific controls, there's nothing we can do for you. And the only case they cited was a case where they said the same thing. They've never addressed our policy. If the question before us involves the scope of the holding in Union Pacific though as opposed to the proper line under the statute, isn't that something we would just decide on our own? They're either right or they're wrong that Union Pacific extends to this kind of claim. But it's a question about the meaning of our decision. Would that be something we remand for them to do a State Farm analysis of? I don't think it's it's not the interpretation of the holding but it's a separate argument which we also made which is even if you think that's the holding, you have a discretion to deviate it and that they have to give a State Farm explanation for. Let me address the remedy real quick. I think if the court concludes this case is moot, there is nothing that AFPM has done that created the mootness in this case. It's litigated this case on a normal timeline in all the forums. Thank you. Thank you both. Case is submitted.
judges: Tatel, Katsas, Ginsburg